Before we get started, I would like to take a point of personal privilege and just say that for good or ill, this is my first time to preside in a panel, because it is also my first time to sit with my colleague, Judge Dana Douglas. I'm very excited about that. And we are both excited to welcome Judge Wendy Vitter, who is a district judge on the Eastern District of Louisiana, who is sitting with us by designation for the first time, right, ever. Yes. So welcome, Judge Vitter. I'm not the last. Yeah. It won't be the last, I'm sure. Well, and welcome to Council. Welcome to all of you. So the first case on the docket today is No. 23-60626, and that is the National Association of Private Fund Managers et al. v. the Securities and Exchange Commission. And, Council, I think you've got 15 minutes on your main argument with five for rebuttal. Judge Wilson, and may it please the Court, it's a pleasure to be here for so many firsts this morning. Customer securities loans and short sales are two sides of the same coin. A customer borrows a security to sell it short. Given that connection, the Commission solicited comments on the interplay between these two rules, and then ignored the comments, and the Commission took two inconsistent approaches. The short sale rule provides aggregate data on a lengthy delay because, as the Commission correctly said, providing individual trades or quicker disclosure could give away short seller strategies and lead to copycat trading or short squeezes. But then the securities lending rule requires almost immediate disclosure of exactly the kinds of individual trading data that the Commission said in the short sale rule would harm the market. The agencies never offered any coherent explanation for the inconsistency, as the five former SEC chief economists explained. Those are economists who span administrations of both parties. And it is critically important that agencies consider related rules together, as the Chamber explains. Counsel, so one threshold question. What is the injury that you allege here? So the injury to the appellants, Your Honor, and we explained this in the comment letter to the agency. These trade associations have members that take short positions. And in the short sale rule, what the agency said was, and you can see it most clearly at pages 178 and 182, but also 163 and 164, the agency said, if we allow individual trading data, or we publish anything less than the month after, that poses real harms to the market. This is an incredibly sophisticated market. People hire investigators. They use algorithms. Everybody's trying to figure out what everybody's doing. So we have to publish the data in aggregate, and we have to do it on a lengthy delay. Because if we don't, the harm that will come, the agency said, is if you can figure out that somebody's building a short position, you can copycat or front-run those trades. If I know that you're shorting a stock, I don't have to have done any of the valuable research you performed, but if I think you're right, I can jump into the market, sell at the time you are, having not done any of the work, and I can rob you of the full benefit of the investment of your time and energy. And same thing if I know when you start to take your short position off. You're no longer selling. Now you're buying. I can jump in and buy at the same time, too. And both on the front end and the back end, I can harm you. That's the harm, right, from copycat trading and short squeezing. If others in the market know what you're doing, then you're vulnerable to a number of different harmful trading strategies. Is that a concrete enough injury to confer standing? I mean, so that's a substantive injury based on the effects of the rule, correct? Oh, I don't think — I mean, so the Commission hasn't challenged our standing, and I think because it's clear that would be an Article III injury. That's certainly concrete. It's imminent. In other words, if the Commission acknowledged that the information you're getting from the securities lending rule is actually disclosing short sales, as we say it is, and I hope I can explain why during the argument. If we all agreed on that premise, I think everybody would agree that we would have concrete harm. If you knew what people in the market were doing in terms of short selling, absolutely. Your competitors could come in. They could front run. They could squeeze your position. You'd harm both the people trading in the market and, as the Commission said in the short sale rule, you'd harm the market because you would increase the cost of short selling, and short selling is valuable. It leads to price discovery, and that way you know what these companies are actually worth. So short selling is valuable to the market, too. Now, what happens on the short securities lending side, and this is really important, so I'll just give you one concrete example. Once the rule is implemented — today's Monday — I'll be able to look back on the previous business day, Friday, and I'll be able to see number of customer loans in aggregate amounts. So let's say there's five customer loans, and they total $100 million of, say, Microsoft stock. I'll know that someone — I may not know who yet, but I'll know that someone is building a short position in Microsoft, even though I can't see the individual sizes of those loans. And that is exactly the information that, on the short sale side, at, like, page 182, the Commission says, we can't have that. We have to disclose that information next month and only aggregate it across the entire market. I'm glad you're going into the substance. This is one of the areas I thought was interesting. I mean, a lot of your theory of the case rests on the idea that the information that is required to be disclosed under the securities lending rule is tantamount to disclosure under the short sale rule, but the SEC considered that, did they not? And they considered the different comments, and they said, well, no, these are distinct rules that require distinct information. So I don't think it's fair to say that it did in two different ways, Judge Wilson, and this will take me just a minute to explain. So you can see the aggregate number of customer loans, so you know somebody's building the position. Now, if it's a thinly traded security, it's even worse than that. There may only be one customer loan. Now you even know the individual size. And you can see the modifications, which means next business day, you'll at least see when the aggregate amount begins to drop. So you see when they're building the position, and you see when they're taking the position off. That's what they said on the short sale side they didn't want. Now, did they consider that in the securities lending rule? The answer is no. Nothing I just said turns on individual loan and not a word about any of the inconsistencies I just talked about are in either one of these rules. What they say at pages 709 and 710, Judge Wilson, to be fair to them is, they say, well, we're going to delay individual loan size, and that's going to solve the problem. Now we're not disclosing short seller strategies. Well, one, that's still inconsistent with the short sale rule, which has no individual trade disclosure, not even for loan size. And two, it doesn't deal with all of the other ways in which disclosure of the other information, not the loan size, the aggregate amount, all the things I just talked about. I didn't talk about a single thing about individual loan size. They didn't say a word about, well, wait a minute. Commenters have sent in these comments that we've solicited saying there's inconsistencies, and that if we give out this data, we will, in effect, be disclosing short sales. If you look at pages 709 and 710, there's nothing about it. Now, to be sure, they assert, on balance, we've looked at it, and we think if we delay loan size, that's good enough. But when you think, like my kids, I tell them, how did you get there? When you look at 709 and 710, you say, okay, well, why is that good enough if you just delay the loan size? There's nothing. It is just the assertion that on balance it's enough. And as I said, even that assertion doesn't cover them, because it's still inconsistent with the short sale rule, because it's still giving individual data. To follow up, at your opening, you said the Commission ignored negative comments. Can you give me the record evidence to support that statement? Sure. So it's a little bit like the dog that didn't bark, Judge Vitter, the agency proposes the securities lending rule. And then when it puts out the proposed short sale rule, it reopens the comment period on the securities lending rule. As an aside, is the timeline that the SEC set out of everything that occurred with the securities lending rule and the short sale rule, starting from November 18th, 2021, to final adoption October 13th, 2023, is that a correct timeline? The timeline in their brief? Yes. I believe so, Judge Vitter. I don't remember any material. I think we're all agreed on the facts of what happened. They reopened the comment period on the securities lending rule. And then my clients and many others put in comments that say, wait a minute, you are proposing to disclose a rich mosaic of individual information that is going to show people short sales, which is exactly what you said you did not want. And the agency, normally in these rules, what you see is you see the passage where the agency comes back and says, we got comments from many different folks, AIMA, NAPFM, and so on, and here's why we don't think the rules are inconsistent. Here's why we think that disclosing this individual trading data won't harm anyone. There isn't a passage like that in either one of these rules. They do not directly respond to any of the commenter's concerns. What they do say, as I was and say, well, we delayed loan size, and we think that's the silver bullet. That takes care of the problem. We weren't given an opportunity to comment on that silver bullet, but even setting that to the side, it doesn't solve the problem. Didn't the commission say they held over 50 meetings on the rules, including six with petitioner MFA, three with AIMA? Oh. Judge Vitter, we're not here saying that they didn't otherwise have a fulsome notice and comment period. They did. They allowed comments. They reopened one period. They met with a lot of folks, and then once they had both rules on the table, we came in and said, wait a minute, okay, on the short sale side, you've tried to be careful. You're going to do aggregate data, and you're going to do it at a delay because you don't want to give away what people are doing in the market, but what you are doing on the securities lending side, you are dumping a ton of information into a very sophisticated market, and people will be able to see what you're doing. That's your argument, and I don't discredit the argument on the merits or what have you, but it was made before the SEC. I'm just struggling to see where is the line where we get into arbitrariness or capriciousness in what they finally promulgated as the final rules. So I think the chamber and the five chief economists, Judge Wilson, I think do a great job of explaining this. The SEC is like other agencies. It has a practice that when you have two rules and they clearly bear on each other, it addresses them straight up, and as the chief economists explain, I think best at pages 9 and 19 of their brief, that didn't happen here. I really recommend that brief to the court's attention. Those economists span administrations of both parties, and they say, so it's not just my word, they look at the rule and they see it the way that I do. They say there is a flat inconsistency here between giving lots of individual trading data that will, in effect, disclose short sales and saying— The question is, and I'm sorry to interrupt, but the question is, does the SEC have to agree with that? In other words, if they consider it and they say, well, we're proceeding this way, we'll explore that with counsel opposite, but they can certainly have rules on parallel tracks or whatever it is, but where do we get into arbitrariness? There's a better way to do this is not enough. There's a different way to do it that we would prefer is not enough. So is it a cumulative effect of all of this that gets us there, or is there something we can point to that says—I mean, I get your argument that you say that the information that they didn't want to disclose under the short sale rule is exactly what, but it's not exactly, but tantamount to what they're requiring, and so there's an inconsistency. Is that it? So, Judge Wilson, I think so. I think this is the easier case. In other words, if you sent these rules back to the agency and they supplied an explanation for why they had taken the two inconsistent approaches, and then I were back here on a true arbitrary and capricious claim, I grant I might have a tougher time. The problem is that having submitted the comments, they didn't address it. They could have said a lot of different things. They could have said, look, we recognize there's some inconsistency between the rules. Here's why we think the benefits of that on the securities lending side outweigh the costs, or here's why we think that giving out the aggregate amount of customer loans is not tantamount to disclosing short sales, or here's why we don't think that we should delay it on the securities lending side because there's some pressing need for transparency that overcomes the harms to the market. There are a number of different things they could have tried to say, Judge Wilson. Now, I don't want to hide the ball. I'm likely to be back here and say they don't make much sense. If your left hand and your right hand are doing two different things, but I don't need to be right about that. I don't need you to be with me on that. I just need the court to believe, as the chamber explains, that when agencies do two related rules and they take, as the economists say, approaches that are inconsistent on their face and they have in front of them comments pointing out the inconsistency, they need to directly address it in the rule, and with all respect, if the court goes through the rules, it will find that the agency did not do that here. It's got some conclusory assertions on pages 709 and 710 of the securities lending rule, and that is as close as the agency gets, and with all respect under the APA, that's just not good enough. Your chief economist, your former chief said, they say several times that wasn't the best practice. Is that the standard you're asking us to look at? No, I mean, look, not, I think what I'd say, well, I don't think, I think they're one and the same. So when the D.C. Circuit says in Portland cement, you have to consider related rules, or this court said it in the Miffitt-Pristone case. The agency made a bunch of different amendments to the Miffitt-Pristone regulation, and this court said, look, you never considered the joint effect. You've treated them as if they were all isolated. The Supreme Court reversed on standing grounds, but it didn't touch that reasoning, which makes perfect sense. If an agency does a lot of related things, it needs to consider their joint combined costs and effect, and so the courts have already said this, including this court, effectively, Judge Vitter. So all the chief economist did is give the court comfort that reaffirming that as the legal standard is not some big deal. This is what the SEC routinely does. It does it with other rules. It did it with best interest and CRS in 2019. It did it with liquidity and modernization in 2016. What's unusual about this is that these rules consider the effect of lots of other rules. They just don't consider the effect on each other of the rule that is right in front of them, staring them in the face. Now, there's a charitable explanation for that, which is they just didn't have a great response to the comments, and so they sort of stuck their head in the sand, and there's a less charitable explanation, which is they were hemmed in on the short sale side by Dodd-Frank. They could give only aggregate information and only up to a month's delay, and they couldn't do anything else on the short sale side as a matter of the statute or cost-benefit, but they wanted to give out more information. So what they do is they do securities lending first, and they decide we're not going to say anything about short sale. If they'd done short sale first and talked about all the harmful effects of disclosure and then done securities lending, well, the inconsistency would be staring us all in the face. So they do securities lending first and say we're not going to consider that one. That one's not final yet. Even though it's on the agenda for the same meeting, it's going to be adopted in a matter of minutes, and everybody and their grandmother knows it. Is there anything in the record, though, to support that theory? Well, I mean, beyond res ipsa? No. I mean, in the sense that, you know, they have securities lending, and they say we're not going to consider that one. That one's not final yet. Sure, we're going to finalize in a matter of minutes, but we're not going to look at that one. Then they come along in the short sale rule, and they say, well, we're going to bake it into the baseline, which means we're just going to assume it's already on the books and in effect. But they found no cost over on the securities lending side. So, of course, when they bake it into the baseline of the short sale rule, what do you know? No cost there either. It's just rainbows all the way down. And then when they start talking about the harms to the market from disclosing the short sale information, they don't have to jump back and talk about the securities lending rule, because they already finalized that one. Thank you, counsel. I know you saved time for rebuttal. Thank you. May it please the Court. Emily Truparisi for the United States Securities and Exchange Commission. The rules under review exemplify reasoned decision-making and should be affirmed. I'd like to address a few points that came up in the colloquy with Petitioner's counsel. These rules are consistent. There was the assertion that securities lending and short sales are two sides of the same coin, but these rules are different, and the differences tie into the way the different approaches to reporting and dissemination that are exemplified in the rules are appropriate. To just highlight a few differences, they apply to different markets. The securities lending rule applies to the securities lending market. The short sale rule applies to short interest reporting. The securities lending market is used for many things. One of them is short sales, but it's also used for hedging, obtaining collateral, other information. They apply to different regulated entities. The securities lending rule applies to securities lenders. The short sale rule applies to institutional investment managers. They require very different data, and this is important. The securities lending rule is a transaction reporting regime. The securities—excuse me, the short sale rule is a position reporting regime. The transaction reporting regime includes lots of things like type of collateral, loan rate, and loan rate distribution that it wouldn't even make sense to aggregate, whereas position reporting, you aggregate large institutional positions so aggregation makes sense, and this distinction that you see between transaction reporting and position reporting is how it has sort of always worked in the stock market. Even for things like long reporting, you have transaction reporting, which is usually done to the SROs like FINRA or the exchanges, and then you have position reporting, which is usually done to the commission via, for example, Form 13-F, and so this distinction you see is sort of how things have always worked, and position reporting is usually done, again, in an aggregated, delayed basis. They have different purposes. Borrowers and—the short sale rule is—excuse me, the securities lending rule is so borrowers and investors can see things like rates, modifications, and compare the rate they're getting with those in the market. They're so different. Why did you reopen the comment period on the securities lending rule when the short sales rule was proposed? Well, certainly, Your Honor, it was reopened to see whether there was an effect from the second rule on the first. How come the agency has to know that these were sort of proceeding in tandem and that there would be effects from one rule to the other and vice versa? Well, I'm not sure that there is record—they are a completely independent rule, and so it's not at all clear in the record that there are effects from one on the other. The argument I hear petitioners making is that the regimes are inconsistent, but I haven't heard them say one, like, effect of one rule on the other. So I don't— I'm saying the effect of the securities lending rule is to disclose the very things in the short sale rule that the agency said we want to protect that don't need to be disclosed. Right. And to get to that point, Your Honor, it's very clear that in both releases, what the agency is doing is it's balancing the goals of increased transparency from Congress in both cases and the goal of not disclosing too much information too quickly. And it— And the record is the articulation of the cumulative effect of both rules on the industry. So, Your Honor, it is done in both of the releases. The way the Commission did the economic analysis—and this is important—it's an incremental baseline approach. This is the way the Commission does economic analyses. You take the costs and the benefits of the first rule, you analyze them, and then you take the cost—and then what the Commission did is took—in the second rule, it took that as part of the baseline and it analyzed the incremental costs and benefits over and above that baseline. The cost and benefit of both rules in tantum. There is nothing—the APA does not require the costs and benefits of both rules in tantum. And this is important, Your Honor, because the way the Commission does it ensures no cost is left out. And Petitioners have not asserted a single cost from either rule that has been left out in the Commission's consideration. There are the costs and benefits in the first rule and the costs and benefits in the second rule. And because the second rule is incremental and on top of the baseline, which includes the first rule, it ensures there is no double counting, but it ensures that no cost is left out. And Petitioners have not suggested a single cost that was not considered by the Commission or left out. Is there any kind of analysis of the cost of these disparate reporting regimes? Because they're not consistent. I mean, they're different times, different information, different frequencies, and yet they're sort of very often the same — the two sides of the same transaction, right? So is there anything like that that considers both of them? I guess I'm asking about compliance costs. Right. So there — so again, because they're incremental, there is a fulsome — full analysis of both costs. And then the Commission recognizes, and I think this goes to Your Honor's question, Justice Wilson, that there could also be additional costs from perhaps some sort of like synergy or interaction because of overlapping compliance periods — overlapping compliance periods, and the Commission considers that. So again, nothing gets left out in the way the Commission does the economic analysis. And just to push back on the — a little bit on the idea that they're two sides of the same coin, again, the Commission was consistent. It understood that the closest piece of information from the securities lending rule that is like the information in the short sale rule is loan size information. And that metric, it delayed by 20 business days the public dissemination of that, again, so that the rules would be consistent in their approach of — they have to balance two things, right? Congress has said you need to increase transparency in both of these markets, but they also recognized that disclosing too much information too quickly could have negative effects. How does that mitigate the risk of reverse engineering the data? So the Commission was very specific on this finding, Your Honor. You can look at the record at 665 and at 711. It picked the 20 business day delay, which ends up being about 30 days, because then the short — the information about loan size information, which is what's most tied to short position, would be less timely than preexisting sources of short sales transparency. Because FINRA already publishes certain bimonthly short interest data, so this information would be less timely, would be not — novel than data that's already out there. And so it would not be able to reverse engineer. So it specifically took that into account. Also, I want to push back on the idea that the Commission did not consider the different approaches. In the record of the securities lending rule at 726, the Commission recognizes that if you took an aggregate-only approach in the securities lending space, i.e. the approach taken in the short sales space, to this different market, different data, you would reduce the risk of exposing short sales strategies, but it would also mean much less transparency for the securities lending market. It would lead to less benefits on competition, price efficiency, so it would reduce the benefits. So again, it's — the Commission is weighing different competing policy interests, it is considering all the comments, and it is choosing, you know, making policy tradeoffs as its purview. Counsel, how do you address Appellant's argument that the amicus brief, especially the ones — there are many of them — especially from the former SEC chief economist, say that what the SEC did here was different than what it's done for years and was not a best practice? That's what they used a So I think the examples that they used to make that point are just different in kind. So in the examples that that brief points out, you have rules that are much more interrelated, such that one of them either depends on the other to function, or is like a form that fills out the other, or like in the Portland Cement case that my friend mentioned, you have two rules, the second of which changes the definition so that an entire segment of the first rule no longer is covered under that definition. So they interact with each other in a particular way, such that consideration of them together makes sense. That is not what — yes, Your Honor. I go back to this idea that you reopen the comment period on the securities lending rule. How often does that happen for independent rules? You call them independent. I don't know how — I mean, I can tell you that the Commission often reopens comment periods. I don't know how often, but — But for a particular — for a particular proposed rule that's also pending? It happens — I mean, it would reopen for proposed rules to ensure that the — to ensure that the regulated parties have an opportunity to comment. But I think it's important the way it was opened. It said, you know, whether there is an effect. And what you heard commenters say is these rules — they didn't say this rule affects something this way, so you need to, you know, consider them together. They said these are inconsistent. We prefer the approach to disclosure in the short sales rule, but the Commission — Well, they said they were inconsistent because the one rule was going to disclose the very information that the other rule was supposedly protecting. Did the Commission respond to that? Did the Commission explain how — you heard counsel explain all that and how that was the case. Did the agency explain that sufficiently? Yes, Your Honor. I mean, the agency took very seriously the concern about revealing too much information, but it found that the 20-business-day delay would greatly mitigate that. And that's throughout the release. It's at 665. It's at 711. It said that the 20-business-day delay would make it such that existing data providers' information would be considerably timelier than that provided by the rule. So the rule should not allow the reverse engineering concern. Now, it did say that there may be some modicum of novel information. Again, it took this head-on, but it said that the benefits of the increased transparency to the securities lending market outweighed — it said on balance outweighed — would be net positive the benefits of the securities lending rule to transparency, which is what Congress told the Commission to do, to increase transparency in the market. So you see explicit weighing. You see language like on balance, net positive. So it directly considered those costs. It said between the benefits of the securities lending rule and the 20-business-day delay. I'm sorry. It didn't consider the disclosures required by the short sale rule because I thought the agency took the position, well, that's just proposed. We don't consider those things under proposed rules. But that seems quite inconsistent, actually, with reopening the comment period under the rule. I mean, it's sort of like having cake and eating it, too, right? They're independent rules, independent rules, but they're very interrelated. Is that arbitrary? No, Your Honor. Again, because it considered — there's nothing about the way the ordering that leaves any costs out. Again, if they could point to something about the ordering that leaves costs out, then it might be a different situation. But Petitioner's time not pointed to a single cost that the Commission failed to consider. In the second rule, the Commission considered the use of combined data sets, but it said that because of the delay, that it's still protective of short sellers' proprietary information and fundamental trading strategies, while still getting the benefits to the market that Congress directed the Commission to do in both of these rules. So it's taking them both head-on. Petitioners haven't suggested anything. And in the first sale — excuse me, in the first rule, while it didn't expressly, you know, do what petitioners are saying, which is consider them both at the same time, it certainly considered the approach, the aggregate-only approach, because commenters brought it up, and the Commission recognized that aggregate-only data would reduce the risk of exposing certain strategies, but it said it would mean less transparency for the short-sell market. So again, on balance, it weighed the costs and benefits, and the Commission drew the line where it is. And that kind of line drawing and weighing is expressly what's in the Commission's discretion to do. I want to — because maybe I'm not completely understanding — I want to just ask again what Judge Wilson asked, and I'm going to quote from your brief. The SEC said it did not consider a proposed rule because it would be just that, a proposal. It would be nonsensical. That makes sense. You have plenty of proposed rules, I would assume, out there. But further in your brief on page 32, you say the Commission expressly included the rule adopted first, the securities lending rule, in the baseline of the economic analysis of the rule it adopted second, the short-sale rule, a reasonable approach that leaves no gaps in the economic analysis and avoids any possible double-counting. What is the relatedness? What is the SEC's — you told us a lot of differences. Tell me how they are related. What's the SEC's position? Sure. So what the Commission said is that the piece of information that is most related from the securities lending rule is aggregate customer loan sizes. And you can see the Commission talking about this at 7.05 in the securities lending rule. It says that information could be used to, quote, gain insight, but it's still a noisy approximation for that. And the data is — so it's not a perfect one-to-one match. You can gain insight from using aggregate customer loan sizes to try to measure short position interest. But even delayed data is still noisy because — and the Commission talked about this, and it's in the securities lending rule at footnote 900. Some borrowers, like institutional investors, break up their loans across multiple prime brokers. So that piece of information is the most related, but it's still a noisy approximation. They are different for all the reasons, you know, I talked about. But that is the piece we're the most related. And that is why, because the aggregate customer loan sizes is the piece that's most closely related to disclosing short position, that is why the Commission, in response to comments, decided to make a change from the proposal and to delay the dissemination of that information for 20 business days, effectively a month, making the data less novel than data that's already available through commercial vendors to market. I just want to go back to one other point where I was going through the differences. I think I stopped at different purposes. So the first one is borrowers and investors can see things like rates and modifications. Short sales is for understanding short interest. There are also different sources of authority. There are different sources. One is Dodd-Frank 984. One is Dodd-Frank 929. And again, these differences directly tie into the different rationales for reporting and dissemination. These are just very different things. They are related through the one narrow lens that petitioners want to view this case through, which is protecting fundamental trading strategies. But the Commission took, you know, that is not, the test is not does either rule disclose a modicum of information about fundamental short sales strategies. The Congress directed the Commission in both rules to increase transparency in the market. The Commission was weighing comments from petitioners and similarly situated people saying, you know, don't disclose too quickly. There were commenters on the other side, mostly retail investors, saying we need this information. You should disclose it more quickly. So again, the Commission is doing what it does. It is weighing these policy concerns. It is making record judgments. It's considering all the comments and it's drawing the line. But it did not ignore anything about the relatedness. It did not ignore anything about the effects. The way it did its economic analysis did not leave anything out in terms of any costs or benefits. And unless the Court has any further questions, we'd ask the Court to deny the petition for review. Did the Commission act differently in this, in considering these two rules than it has in any other, in deciding or promulgating any other rules? And can you give us any example? Act, I mean, there are examples discussed in the briefing where petitioners assert the Commission acted differently. But again, I think those are distinguishable because they're the rules did require each other to function in some way. These are independent rules. Nothing about the first one requires the second one to function or vice versa. And so the Commission did what it normally does, which is in the first rule, it considers the baseline, as Your Honor was saying, of all adopted rules. And then in the second rule, the Commission considered the baseline, including all adopted rules. So that is the Commission's usual approach. It's... I'm sorry. Yes, Your Honor. If the Commission siloed these two rules and they did everything that the APA requires for one rule and they did everything that the APA requires for the other rule, but they siloed them and they didn't consider them together, rules clearly related, and would that be arbitrary and capricious? I think it would depend on if the siloing missed any interaction between the rules or any synergy between the rules. If they were, if siloing didn't affect anything, then it may not be. I think it would just depend on the two rules. Because here, there's no suggestion that if the Commission had, for example, done it, there was the idea that if the Commission had done it in the opposite order, it would be different. But that is not, they have not shown why that would be so. It's just two different ways to get to the same place. Again, because of the way the Commission does its incremental economic analysis, you do one and then the other, there has been no suggestion that doing it the other way would have gotten you any different. You still get to the same place at the end, which is the combined costs and benefits of both. So again, I think, to take your hypothetical, it would just depend on how the rules interacted. But if they were truly separate, then not necessarily arbitrary and capricious. Again, it depends, using the word related, it depends on how they relate. There are different ways rules can interact. Here, they are independent. They are about very different markets. There's no suggestion that the Commission missed some interaction or synergy such that it left out some sort of cost or benefit that the petitioner said should have been considered or that a commenter said should have been considered. And so again, because of that, the rules here were certainly not arbitrary and capricious. Thank you, Counsel. Thank you. Counsel, you have five minutes for rebuttal. Just three basic points, Your Honors. The first is, these markets, the Commission said at pages 696 and 710 of the Securities Lending Rule, are tightly linked, and there is a close correlation. Your friend on the other side gave a number of differences between the two rules, saying that they require different data, different authorities, they have different purposes. How do you respond to that? So the first thing to just to note, Judge Douglas, is that there are the customer loan market highly correlated with the short sale market, right? If you have a customer loan, it is nearly always matched up one for one with a short sale. The Commission recognizes that. If you're giving out information about customer loans, you're tipping off people to short sales because of a Regulation T that limits the ability to make customer loans other than for short sales. So then, that's first question. Then second point is yours, okay? Is there inconsistency between these two rules? Is there some interaction or synergy in counsel's words that the Commission didn't consider? And the answer is yes. If you look at the short sale rule, page 178, the agency says, it is not enough even to anonymize this data. People hire investigators to figure out what other firms are doing. They use algorithms. Anonymizing the data is not enough. We cannot give individualized data. It has to be aggregate. And then at 182, they say, and we consider doing it more frequently, and that too would harm the market. Aggregate on a delay. That's the short sale rule. Then you look at the securities lending rule. It's giving out a lot of individualized trading data. And so you say, okay, well, how is that consistent with what you said over in the short sale rule where you said even anonymizing it isn't enough if you give out the individualized data? And at 709, 710 of the securities lending rule, the agency says, but we're not giving you individual loan size, and we think that's enough. You still don't know, well, why give out the other individualized data, right? You don't give it anything individualized on the short sale side. And why is loan size enough when you can use the other data to figure out that managers are building these short positions and then unwinding them? And on that, there is silence from the and being able to see the modifications, not the individual amounts, but the modifications to the aggregate over time lets you know that people are building positions and then taking them off. And there is no explanation in either one of these rules for how you square that with what you did on the short sale side. That's incredibly harmful, Judge Wilson. These firms, the large ones, the large managers, the ones you get the data for on the short sale rule side, they spend a lot of time proprietary research to try to figure out when they believe that companies are overvalued. If you allow others to know what they're doing in the market, when they're selling to build a position and when they're buying to cover the short sale loan, you will get lots of things. You can get short squeezes, right? They're vulnerable to people trying to drive up the stock price. But the most important is that people front run. They jump into the market at the same time. They dilute the value of the position, and they rob part of the value from the people who did the work to actually create the price discovery and the efficiency in the market. That's incredibly harmful to these firms. The commission recognized that on the short sale side and then turned around and put blinders on on the securities lending side. We're not saying that the agency has to, or the court has to get into any of that. All the court has to do is to say, these are related rules. The agency did not consider them in tandem. It didn't consider this apparent inconsistency that people commented on. We're going to send it back, let the agency do its homework, and then, if needed, someday the case could come back, and this court could consider it on the record it should have from the agency. But what if counsel's point, counsel opposite says, well, all costs were considered, and they have an incremental sort of baseline approach, how is that arbitrary and capricious? Because they didn't take into account any of the costs from the individual disclosure on the securities lending side. So when they say, oh, we baked it into the short sale rule, they haven't considered those costs on the securities lending side. Those are more than zero, but they're treating them as zero. And then in the short sale rule, they just consider the short sale rule. They don't consider combined cost. So when you said, where's the discussion of cumulative effect, I and five former chief economists of the SEC say exactly the same thing. I look through the rules, and I don't see it. If they had said, look, here are the harms from this individualized disclosure, we acknowledge that on the short sale side, but here's why we're going to draw a different balance, we're going to reach a different net positive on the securities lending side, fair enough. This would be a totally different case. But they did two different things with their left and right hands, and they didn't reconcile them. And they say, well, we didn't have to because the rules weren't interrelated, by which they mean they didn't require the other one to function. That has not been the SEC's practice. No court has taken so narrow or blinkered a view. The best interest in the CRS regulations in 2019 could have functioned independently, but they were clearly related. The right test, as the chamber says, is are they related rules, is the agency aware of the relationship, and are they contemporaneously adopted? Thank you, counsel. Thank you.